UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------
:
INVACARE CORP.                              :         CASE NO. 1:18-CV-62
                                            :
         Plaintiff,                         :
                                            :
    vs.                                     :         OPINION & ORDER
                                            :         [Resolving Doc. 17]
MICHAEL NORDQUIST, et al.                   :
                                            :
         Defendants.                        :
                                            :
------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this action, Plaintiff Invacare Corporation ("Invacare") moves for a preliminary injunction against its former employee, Defendant Michael Nordquist, and Nordquist's current employer, Defendant Ki Mobility.[1] Plaintiff Invacare alleges that Defendant Nordquist broke his non-competition agreement by working for Ki Mobility and alleges that Nordquist misappropriated Invacare's trade secrets and confidential information.[2] Plaintiff Invacare also alleges that Defendant Ki Mobility induced and encouraged Nordquist's contractual breach.[3]

Plaintiff Invacare now seeks an injunction requiring Defendants to comply with the two-year non-competition agreement that Defendant Nordquist signed during his Invacare employment.[4]

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for a preliminary injunction.

---

[1] Doc. 17. Defendants oppose. Doc. 22. The parties have also filed pre-hearing, Doc. 26 (Plaintiff's pre-hearing brief); Doc. 27 (Defendants' pre-hearing brief), and post-hearing briefs. Doc. 31 (Plaintiff's post-hearing brief); Doc. 32 (Defendants' post-hearing brief).
[2] *See generally* Doc. 1.
[3] *Id.*
[4] Doc. 17.

Case No. 1:18-cv-62
Gwin, J.

## I. Factual and Procedural Background[5]

Our economy ultimately depends on property rights, enforceable contracts, and free market competition. But when employers seek to limit competition by requiring their employees to agree to restrictive employment covenants, those foundational principals come into tension. That tension is on full display here.

### A. Invacare and Ki Mobility

Plaintiff Invacare and Defendant Ki Mobility both design, produce, and sell a wide variety of specialty wheelchairs and assistive seating devices. Both companies have the same three major customers---NuMotion, the Veterans Affairs Hospitals, and National Seating & Mobility (NSM). Those three customers account for between seventy and eighty percent of the market.[6]

Each of these three major customers establish product formulary lists. Sales from companies on those formulary lists give purchasing agents higher commissions, and inclusion on the formulary lists is extremely important.[7] Individual chair sales are made through local Assistive Technology Professionals ("ATPs") when individual customers fill wheelchair prescriptions.[8] But because ATPs receive higher commissions for sales on the formulary lists, inclusion on those lists becomes extremely important.[9]

### B. Nordquist's Invacare Employment

Defendant Michael Nordquist worked for Plaintiff Invacare for approximately thirteen years, from 2004 until September 2017.[10] Before working for Invacare, Nordquist earlier worked seventeen years in various sales, training, and design roles for another assistive seating company, Jay Medical.[11]

---

[5] The Court makes the following factual findings based on the testimony and evidence presented at the May 3, 2018 preliminary injunction motion hearing and the parties' docket filings.
[6] Doc. 30 at 21:13-22.
[7] *Id.* at 24:22-25:5.
[8] *See id.* at 23:24-25:5.
[9] *Id.*
[10] *Id.* at 78:17-18; 79:24-80:2.
[11] *See id.* at 72:17-20; 98:15-17. At some point during Nordquist's tenure at Jay Medical, Jay Medical was purchased by a larger, similar company, Sunrise Medical. *See id.* at 100:12-14.

Nordquist quit his job at Plaintiff Invacare to take a Ki Mobility position in September 2017. Since October 2017, Defendant Ki Mobility has employed Nordquist as a regional sales manager.[12]

On March 1, 2004, Defendant Nordquist and Plaintiff Invacare entered into a non-disclosure, non-competition, non-recruitment, and non-interference with customer relationships agreement.[13] That agreement forbids Nordquist from disclosing any of Invacare's confidential information.[14] More important for this case, the agreement also prohibits Nordquist from working, consulting, or assisting any Invacare competitors for two years after his Invacare employment.[15] Additionally, that agreement forbids Nordquist from "contact[ing] or do[ing] business with any customer or supplier of [Invacare] with respect to any" product that might compete with Invacare's for the same two-year period.[16]

At Invacare, Nordquist worked in product development roles. Most recently, Nordquist worked as a director of product management.[17] In this role, Nordquist helped to design, produce, and sell new wheelchairs in Invacare's custom manual wheelchair business.[18] Nordquist focused on Invacare's tilt-and-space, pediatric, and active product lines.[19] Nordquist's ultimate position goal was to facilitate bringing newly designed wheelchairs to market.[20] Nordquist supervised approximately 10-15 percent of Invacare's product offerings.[21]

With his Invacare final position, Nordquist did not interact with customers in his day-to-day responsibilities.[22] However, Nordquist interacted with customers at trade shows or to assist with customer service issues regarding wheelchairs that Nordquist helped design or create.[23]

---

[12] *Id.* at 80:6-12.
[13] *See generally* Doc. 1-1.
[14] *Id.* at 3.
[15] *Id.* at 4.
[16] *Id.* at 4.
[17] Doc. 30 at 106:2-5.
[18] *Id.* at 106:6-11.
[19] *Id.*
[20] *Id.* at 27:6-14.
[21] *Id.* at 52:5-6.
[22] *Id.* at 107:21-108:4.
[23] *Id.* at 108:5-17; 109:1-4.

As an Invacare director of product management, Nordquist participated in high level weekly and monthly meetings to discuss Invacare confidential information.[24] Weekly meetings included "all the commercial happenings in the last week, competitor threats, new product launches from competitors, [and] sales rep performance."[25] During monthly meetings, participants gave a "full business unit review . . . where [Invacare would] go through the entire business."[26]

Additionally, Nordquist helped to develop Invacare's three-year strategic plan.[27] The current plan continues until 2020.[28] To develop that plan, Nordquist worked with Invacare's customers, end-users of Invacare's products, and clinicians.[29] Nordquist then worked with Invacare engineers to manage products throughout the new products' development cycles from developing initial requirements to final marketing.[30]

Because of his involvement in developing and implementing this three-year plan, Nordquist learned Invacare's general pricing strategy, product roadmap, and commercial initiatives (e.g. which parts of the market Invacare intends to emphasize) until 2020.[31] However, these plans can change and this information is usually updated monthly.[32] Nordquist would not have knowledge of any updates to Invacare's three-year product plan that occurred after he left Invacare.[33]

### C. Nordquist's Role at Ki Mobility

In October 2017, Ki Mobility hired Nordquist as a regional sales manager.[34] Nordquist accepted Ki Mobility's employment offer while still employed at Invacare.[35] In that Ki role, Nordquist

---

[24] *Id.* at 33:14-34:1.
[25] *Id.* at 33:15-18.
[26] *Id.* at 33:23-34:1.
[27] *Id.* at 31:8-18; *see also* Pl. Ex. 8.
[28] Doc. 30 at 27:2-3.
[29] *Id.* at 26:6-12.
[30] *Id.* at 27:6-14.
[31] *Id.* at 34:8-23.
[32] *Id.* at 76:2-21.
[33] *Id.* at 76:22-77:2.
[34] *Id.* at 118:19-119:1.
[35] *See id.* at 88:25-89:22.

oversees Ki Mobility's northeast region sales force in order to increase the sales force's efficiency and sales.[36]

In his Ki Mobility employment, Nordquist meets with customers during two opportunities, when he travels with salespeople and at Ki Mobility trade show booths.[37] Nordquist also helps assemble sales agreements, but he does not have final approval over those agreements.[38] Nordquist also establishes sales quotas for his sales associates.[39]

### D. Procedural History

On January 9, 2018, Plaintiff Invacare sued Defendants Nordquist and Ki Mobility. Invacare alleges that Nordquist has breached his non-competition agreement and has misappropriated Invacare trade secrets. Invacare also alleges that Defendant Ki Mobility unlawfully induced Nordquist to breach his non-competition agreement.

On April 6, 2018, Invacare moved for a preliminary injunction against Defendants. Invacare seeks an injunction to enforce its restrictive covenants against Defendants Nordquist and Ki Mobility. On May 3, 2018, the Court conducted a hearing on this motion.

## II. Legal Standard

In deciding whether to grant injunctive relief under Federal Rule of Civil Procedure 65, the Court considers four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest.[40] "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."[41] An injunction is an "extraordinary remedy" available only when

---

[36] *Id.* at 80:13-81:4.
[37] *Id.* at 123:1-3.
[38] *Id.* at 91:6-14.
[39] *Id.* at 91:6-14.
[40] *See* Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 590–91 (6th Cir. 2012).
[41] Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400 (6th Cir. 1997).

Case No. 1:18-cv-62
Gwin, J.

the circumstances "clearly demand it."[42]  "The party seeking the injunction must establish its case by clear and convincing evidence."[43]

### III. Analysis

The Court finds that Plaintiff Invacare has shown a likelihood of success on the merits of its breach of contract claim.  The Court also finds that Invacare has shown a threat of irreparable harm. While the harm to others and public interest factors have little bearing on this case, the Court finds that the first two factors weigh in favor of granting the injunction. Therefore, for the reasons explained below, the Court will **GRANT IN PART** Invacare's motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

Invacare brings breach of contract, misappropriation of trade secrets, and tortious interference with contract claims.  Invacare premises its preliminary injunction motion and evidence primarily on its breach of contract claim.  The Court finds that Invacare's likelihood of success on this claim supports injunctive relief.

Based on the evidence presented thus far, Invacare will likely be able to prove that a valid contract exists between itself and Defendant Nordquist, and that Nordquist broke the restrictive covenants in that contract.[44]  Some of that contract's restrictive covenants, however, do not appear reasonable.  But the evidence shows that less burdensome restrictive covenants should be enforced.

At this early stage, the evidence suggests that Ki Mobility directly competes with Plaintiff Invacare.  Nordquist signed an agreement to work for Ki Mobility while still employed by Invacare and began working for Ki Mobility only days after he resigned from Invacare.  These actions plainly violate the competitive employment restrictions in the agreement Nordquist signed.

---

[42] *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)).
[43] *Draudt v. Wooster City School Dist. Bd. of Educ.*, 246 F.Supp.2d 820, 825 (N.D. Ohio 2003).
[44] *See Lucarell v. Nationwide Mut. Ins. Co.*, -- N.E.3d --, 2018 WL 321683, *8 (Ohio Jan. 4, 2018) ("A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach.").

### 1. Reasonableness of the Contract's Terms

However, under Ohio law,[45] restrictive employment covenants are enforceable only if an employer proves by clear and convincing evidence that they: (1) are no greater than necessary for protecting an employer's legitimate business interest; (2) do not impose an undue hardship on the restrained employee; and (3) are not against the public interest.[46] Ultimately, the crux of this test is whether the restrictive covenants are reasonable.[47]

The primary merits question then, is not whether Nordquist breached the agreement's terms, but whether the restrictive covenants' terms were reasonable. At this early stage, Plaintiff has shown that the restrictive covenants' terms were reasonable in some, but not all, respects.

Ohio courts disfavor restrictive covenants.[48] "Because employment agreement restrictive covenants restrain trade and competition, they are scrutinized carefully to ensure their intended effect is not to prevent competition, but to protect a legitimate business interest."[49] Legitimate business interests are more likely present when an employee has access to confidential information, or when an employee's customer contacts occurred because of his or her employment.[50]

When determining the reasonableness of a restrictive employment covenant, Ohio courts consider:

> [W]hether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and expertise, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's

---

[45] The 2004 contract's choice of law provision chooses Ohio law to govern the contract. *See* Doc. 1-1 at 6. Neither party objects to this choice. The Court will therefore apply Ohio law. *See Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (noting that Ohio law "instructs courts to generally respect choice-of-law provisions" unless one of two exceptions, which are not at issue here, apply).

[46] *See Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *10 (N.D. Ohio Aug. 30, 2016), *appeal dismissed*, No. 16-4142, 2017 WL 4518680 (6th Cir. Jan. 26, 2017) (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 546-48 (Ohio 1975)).

[47] *Brentlinger Enter. v. Curran*, 752 N.E.2d 994, 998 (Ohio Ct. App. 2001); *see also Raimonde*, 325 N.E.2d at 547.

[48] *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 (N.D. Ohio 2009).

[49] *Arthur J. Gallagher & Co.*, 2016 WL 4523104, at *10.

[50] *See id.*

Case No. 1:18-cv-62
Gwin, J.

talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.[51]

The agreement Nordquist signed prohibits him from working for or assisting any "Competitor" in the United States for two years after his Invacare employment ends.[52] The agreement defines a "Competitor" as:

> Any person, firm or organization (and/or parent, subsidiary or affiliate thereof) engaged in or about to become engaged in research on, or the production and/or sale or distribution of any Competitive Product[.][53]

In turn, "Competitive Product" is defined as:

> [A] product which is similar to or competitive with any product manufactured and/or sold by [Invacare], or with respect to which [Invacare] has conducted research, during the three (3) years immediately preceding termination of Employee's employment.[54]

Essentially, this agreement stops Nordquist from working in the United States seating and mobility industry in any capacity for two years after his Invacare employment ends. Further, the agreement prohibits Nordquist from any "contact" with Invacare's customers for two years.[55]

This agreement appears somewhat overbroad in protecting Invacare's legitimate interest in protecting its confidential information and preventing unfair competition. The agreement apparently prohibits *all* competition by Nordquist. Indeed, the agreement's terms would seemingly prohibit Nordquist from engaging in totally non-competitive employment for another company in the wheelchair industry, such as being a maintenance worker or a janitor. As other courts have recognized, a "total ban on any employment in any position with any competitor is not a ban on unfair competition, but a total ban on competition itself, producing a disproportionate benefit to the employer to the employee's detriment."[56]

---

[51] *PolyOne Corp. v. Kuta*, 67 F. Supp. 3d 863, 872 (N.D. Ohio 2014).
[52] Doc. 1-1 at 4-5.
[53] *Id.* at 1.
[54] *Id.*
[55] *Id.* at 4.
[56] *PolyOne Corp.*, 67 F. Supp. 3d at 872; *see also MP TotalCare Servs., Inc.*, 648 F. Supp. 2d at 963-64.

Case No. 1:18-cv-62
Gwin, J.

In sum, the preliminary evidence suggests that while some of the agreement's terms are valid, others are overly broad. Therefore, the Court will enforce some, but not all, of the restrictive covenants.

### 2. Reasonable Restrictions between the Parties

Under Ohio law, restrictive employment covenants are not "all or nothing." Instead, Ohio law "permits courts to determine, on the basis of all available evidence, what restrictions would be reasonable between the parties."[57] Courts may then "fashion a contract reasonable between the parties, in accord with their intention at the time of contracting."[58] Based on the evidence presented thus far, the Court finds that Invacare is likely to succeed in proving that restrictive employment covenants that prevent Nordquist from taking advantage of Invacare's confidential information and customer relationships are reasonable.

Nordquist was intimately involved in the development, pricing, sale, and marketing of a subset of Invacare's product lines.[59] He also participated in weekly and monthly meetings where others discussed Invacare's confidential plans, cost structures, and rollout schedules for future products.[60] Nordquist also helped to develop and implement part of Invacare's three-year product plan; a plan that will be in place until 2020.[61]

Invacare keeps all of this information confidential in several ways. These include marking sensitive documents "confidential," limiting distribution of confidential documents to only those employees that attend certain meetings, and requiring its major customers to sign nondisclosure agreements regarding Invacare's pricing.[62]

---

[57] *Raimonde*, 325 N.E.2d at 547.
[58] *Id.*
[59] *See* Doc. 30 at 20:4-5; 22:21-25.
[60] *Id.* at 29:13-17.
[61] *Id.* at 26:22-24; 27:2-3.
[62] *Id.* at 39:6-40:23; 75:3-13.

Further, as a result of his thirteen years of Invacare employment, Nordquist developed significant customer relationships.[63]

Against this backdrop, the Court finds that Invacare has a legitimate interest in maintaining its pricing and operations information's confidentiality. Invacare also has a legitimate interest in ensuring that Ki Mobility, or any other competitor, cannot use Invacare's confidential information to gain an unfair competitive advantage. Finally, Invacare has a legitimate interest in ensuring that Nordquist does not leverage his Invacare customer relationships to cause a loss of customer goodwill towards Invacare.

Because of these legitimate interests, at this early stage, Invacare's temporal restrictions seem reasonable. Invacare presented evidence that Nordquist worked on Invacare's three-year product plan, and Invacare's restrictive covenant only limits Nordquist's employment for two years. A two-year restriction on positions that could take advantage of Invacare's confidential product development information therefore seems reasonable.

Regarding the contract's geographic restrictions, Invacare shows evidence that Nordquist was involved with its three major customers—NuMotion, NSM, and the Veterans Affairs Hospitals. Each relationship was national in scope. A nationwide geographic restriction is supported.

Therefore, the Court finds that Invacare is likely to succeed in proving that a Court-fashioned restrictive covenant is necessary to the extent that it prevents Nordquist from utilizing the confidential information he learned from his Invacare employment and prevents him from leveraging his Invacare customer relationships.

**B. Irreparable Harm**

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."[64]

---

[63] *Id.* at 35:19-25.
[64] *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Case No. 1:18-cv-62
Gwin, J.

Invacare argues that it will suffer irreparable harm because the potential damage from Nordquist disclosing Invacare's confidential information or unfairly utilizing his customer relationships would be impossible to quantify.

As an initial matter, the Court notes that Invacare has not presented any evidence of actual harm. Invacare offers evidence that Nordquist has interacted with customers during his Ki Mobility employment, but Invacare has provided no evidence that it lost any business or customer goodwill as a result of Nordquist's Ki Mobility employment.

Invacare argues that, in spite of the lack of actual harm evidence, it will suffer irreparable harm because of the inevitable disclosure doctrine.[65] The Court agrees.

The inevitable disclosure doctrine holds that a threat of irreparable harm "can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment."[66]

Defendants do not contest that Nordquist possesses knowledge of Invacare's confidential information and trade secrets,[67] or that Ki Mobility is Invacare's competitor. Instead, Defendants argue that Nordquist's Ki Mobility regional sales manager position is not substantially similar to his role as an Invacare director of product management. This argument seems likely to fail.

As both an Invacare product manager and as a Ki Mobility sales manager, Nordquist's ultimate goal is to maximize the sales of his employer's products. In both roles, he accomplishes this goal by interacting with customers at trade shows and in other venues, and by ensuring that his employer's product better fits a customer's needs than the competitor's product.

---

[65] Invacare originally believed that Nordquist downloaded files from Invacare's computer system, but those files apparently only contained Nordquist's personal information. *See* Doc. 30 at 6:18-7:10.
[66] *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000).
[67] Indeed, Nordquist essentially admitted that he has retained some Invacare confidential information in his memory. *See* Doc. 30 at 131:15 ("I remember bits and pieces of big pictures.").

Nordquist's roles with Ki Mobility and Invacare differ in their stages in the lifecycle of a sale. As an Invacare product management director, Nordquist worked from the beginning of a sale, developing and pricing the product. He necessarily interacted with customers, especially in regards to getting the product on a customer's formulary.[68] As a Ki Mobility regional sales manager, Nordquist does not originally develop products but continues interacting with customers and helps sales associates fine tune the product's pricing and features for sale to individual customers.[69]

Although these roles' day-to-day activities may differ, all of the information Nordquist gained in Invacare product management would be useful to him in selling Ki Mobility products. This is so for two reasons. First, the products Nordquist sells at Ki Mobility directly compete with Invacare products that he developed.[70] Second, Nordquist has the opportunity to interact with and sell to the same customers in both positions.[71]

Therefore, Nordquist's Invacare and Ki Mobility roles appear substantially similar, and so the inevitable disclosure doctrine likely applies. The inevitable disclosure doctrine therefore establishes a threat of irreparable harm.[72]

Additionally, Invacare introduced substantial evidence that Nordquist has already taken advantage of his Invacare-developed customer relationships in his Ki Mobility employment. Nordquist demonstrated Ki Mobility's products to customers at a major industry trade show.[73] Nordquist has therefore already used his Invacare customer relationships during the restrictive covenant effective period.

---

[68] *See id.* at 22:21-23:3.
[69] *See id.* at 90:7-91:14; 122:1-123:3.
[70] *See Stoneham*, 747 N.E.2d at 279 ("Stoneham's position with Alberto–Culver resulted in direct competition between the products that Stoneham formerly supported and the new products for which he had responsibility. Under these circumstances, Stoneham's use of P&G's information and secrets was a very real threat.").
[71] *See, e.g.*, Doc. 30 at 93:8-23 (noting that Nordquist attended NSM's annual tradeshow for both Invacare and Ki Mobility); *see also* Pl. Ex. 35.
[72] *See Try Hours, Inc. v. Douville*, 985 N.E.2d 955, 963-64 (Ohio Ct. App. 2013); *Stoneham*, 747 N.E.2d at 279.
[73] Pl. Ex. 35; Doc. 30 at 36:7-24; 93:5-13.

Case No. 1:18-cv-62
Gwin, J.

If Nordquist discloses any Invacare confidential information or unfairly takes advantage of his Invacare customer relationships, the full extent of the damage to Invacare would be difficult, if not impossible, to calculate. Ohio courts have recognized that injunctive relief is appropriate when the disclosure of confidential or trade secret information might lead to difficult-to-measure damages.[74]

For those reasons, Invacare has established that it may suffer irreparable harm without an injunction.

### C. Substantial Harm to Others and the Public Interest

Neither of these factors tilts the scales in favor of either party.

There is little risk of substantial harm to any non-party as a result of any injunction or lack thereof. There may be some minimal harm to Ki Mobility's customers from removing Nordquist's substantial experience from the marketplace. But this harm is speculative and neither party has presented any evidence of how it might manifest.

Additionally, public interest considerations are essentially balanced between the parties. On one hand, Nordquist possesses Invacare confidential information, and the public interest is served by preventing unfair competition and by upholding valid contracts between employers and employees. On the other, as discussed previously, our economy is based upon business competition. Broad restrictive employment covenants can stifle competition.

Regardless, neither of these considerations is so hefty in this case as to play anything more than the most minor role in the Court's analysis.

### D. Terms of the Injunction

Because of Invacare's likelihood of success on the merits and the threat of irreparable harm, the Court finds that a preliminary injunction is necessary. Nordquist had access to a significant

---

[74] *Stoneham*, 747 N.E.2d at 276 (overturning the denial of injunctive relief "[b]ased on . . . the likely impossibility of ascertaining the actual damages that would result from [defendant's] continued employment with a direct competitor"); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition . . . is likely to irreparably harm an employer.").

amount of Invacare confidential information that would provide an unfair Ki Mobility advantage. Additionally, Nordquist's Ki Mobility employment allows him to take unfair advantage of customer relationships that Nordquist developed and cultivated at Invacare.

The terms of the injunction are as follows:

1. Ki Mobility may continue to employ Nordquist.

2. However, Nordquist cannot work in product development for 18 months from the date of this order.

3. Further, Nordquist may not have any contact with customers insured or purchasing through Invacare's three largest accounts (NuMotion, NSM, and the V.A. Hospitals) for 12 months from the date of this order.

4. Nordquist may not attend any trade shows for 12 months from the date of this order.

5. Nordquist may supervise other sales associates, so long as that supervision does not violate any of this injunction's other terms.

6. Nordquist is prohibited from the disclosure or use of any Invacare Confidential Information, as that term is defined in the 2004 contract.

7. Finally, Defendant Ki Mobility will neither encourage nor cause Nordquist to violate any of the terms of this injunction.

8. Unless previously stated otherwise, this injunction will expire 18 months from the date of this order.

The Court sets the bond in this case at $25,000. This order will become effective upon Plaintiff Invacare's posting of such bond with the Clerk of Courts.

Case No. 1:18-cv-62
Gwin, J.

## IV. Conclusion

For those reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for a preliminary injunction. The Court **ENJOINS** Defendants Nordquist and Ki Mobility as described in Part III.D of this order.

IT IS SO ORDERED

Dated: June 1, 2018
                                                     *s/ James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE